

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-11-00038-CV

IN THE INTEREST OF M.G.P.,
A CHILD

----------

## FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Following a non-jury trial, the trial court signed a judgment terminating Mother's parental rights to her daughter, M.G.P. In six issues, Mother argues that the evidence is legally and factually insufficient to support the trial court's environmental and conduct endangerment findings and best interest finding. Because the evidence is not legally sufficient to support the environmental and

---

[1]*See* Tex. R. App. P. 47.4.

conduct endangerment findings, we will reverse the trial court's termination order and conservatorship order. We will remand the case to the trial court for the limited purpose of rendering an order consistent with family code section 161.205. *See* Tex. Fam. Code Ann. § 161.205(2) (West 2008).

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Events Prior to M.G.P.'s Birth

#### 1. Mother's Other Children

Mother said that she had a four-year-old son, E.G., Jr., who lived with his father, and another son named J.M., who was legally adopted by a woman named M.H. Mother explained that when she separated from E.G., Sr.,[2] her son stayed with him. Mother went to Louisiana after Hurricane Katrina, conceived her third son, J., while she was there, and then came back to Texas. J.'s father did not want to be involved. After Mother delivered, it was "very hard" for her to work and care for J., so the woman Mother calls her mother offered to help out and eventually adopted him.

#### 2. Mother's Drug and Alcohol Use

Mother started using marijuana when she was about fifteen years old, started using crack cocaine two or three days a week beginning in 2008, and

---

[2]Mother initially assumed that she was still legally married to E.G., Sr. even though she had been separated from him for five years. But four months' prior to the termination trial, Mother received a call from E.G., Sr., and he told her that they were already divorced. She last lived with E.G., Sr. in July 2005.

2

drank alcohol in January 2009.  Mother admitted to using crack and cocaine in December 2008 before she realized that she was pregnant with M.G.P.

### 3.  Domestic Violence On or About December 6, 2008

Officer Joel Zuniga with the Fort Worth Police Department testified that Mother told him on December 20, 2008, that her boyfriend J.P. hit her in the stomach around December 6, 2008, and that her stomach hurt for two weeks.

### 4.  Domestic Violence On December 20, 2008

Officer Zuniga testified that in the early morning hours on December 20, 2008, he was dispatched to a call at 3725 South Main Street regarding a burglary of a habitation.  When Officer Zuniga arrived, he spoke with Mother, who said that her boyfriend J.P. had kicked in the back door, had hit her in her stomach several times, and had pulled her out of bed.  Mother ran towards the bathroom to get away from J.P., but he grabbed her by the throat.  Officer Zuniga noted that Mother had bruises around her neck and arms.  Mother was two months' pregnant, and J.P. was the father of the child.  Mother fled to a neighbor's house to protect herself and her unborn child.  Mother said that J.P. was drunk and that he verbally threatened her, saying that he wanted to hurt her and kill her.

J.P. was not arrested that night because he had fled the scene, but Officer Zuniga believed that the detective who was in charge of the case had brought charges against J.P.  Mother admitted at trial that she had continued in a relationship with J.P. for a short time after this incident.

### 5. Drug and Alcohol Use Stops — January 2009

Mother stopped using crack cocaine and alcohol in January 2009.

### B. M.G.P.'s Birth — July 2, 2009

Mother gave birth to M.G.P. at thirty-eight weeks' gestation on July 2, 2009. M.G.P. tested negative for drugs when she was born. Mother tested positive for opiates at the time of M.G.P.'s birth, but JPS staff said that Mother had tested positive due to being given morphine by the doctor; Mother had tested negative for all drugs on a urine screen prior to giving birth.

### C. Events After M.G.P.'s Birth

### 1. CPS Investigator Interviews Mother — July 6, 2009

Jeremy Dickinson, an investigator for Tarrant County Child Protective Services, testified that he was assigned to Mother's case in early July 2009 and that he spoke with Mother at JPS hospital on July 6, 2009, which was four days after M.G.P. was born.[3] Dickinson testified that he gave Mother an oral swab test at the hospital.

Mother admitted to Dickinson that she had experienced suicidal thoughts in the past because of verbal arguments with J.P. and that she had put a knife to her wrists at one point but did not cut. Dickinson checked Mother's wrists to see if she had any cuts from suicide attempts, but he did not observe any injuries. During that conversation, Mother denied any domestic violence with J.P.

---

[3]Dickinson was not aware of any special needs of M.G.P. when she was discharged after birth.

## 2.    CPS Caseworker Interviews Mother — July 23, 2009

Dionne Flowers, a caseworker for CPS and a Family-Based Safety Services worker, testified that she spoke with Mother on July 23, 2009, and performed an assessment, which involved gathering social history from Mother so that Flowers could determine what services were needed. Flowers said that she was looking at whether Mother was planning to maintain her relationship with J.P. and whether the two of them would be willing to work services.

Mother said that she had been diagnosed with depression at JPS Hospital and had been prescribed Wellbutrin.[4] Mother reported that she had thoughts of suicide in October 2008. Mother also reported that she had thoughts of harming J.P. and wanted to hurt him for the abuse that she had incurred. Flowers did not have any information on whether Mother ever tried to hurt herself or whether she tried to hurt J.P.

When Flowers spoke with Mother, she said that she had snorted and smoked crack cocaine for about five months but had stopped using on her own. Mother admitted that she had smoked crack cocaine during the first month of her pregnancy, but Mother did not know that she was pregnant at the time that she used cocaine. Mother said that J.P. supplied her with cocaine, provided all her groceries and personal items, and paid her bills.

---

[4]The last family service plan evaluation prior to trial states that Mother denies any current issues with depression.

Mother mentioned to Flowers some of the altercations that she had with J.P. and said that he was violent toward her; she perceived his buying groceries and providing her personal items as a way of controlling the relationship. Mother told Flowers that she was no longer in a relationship with J.P. but that she would consider restarting a relationship with him if he received help.

After completing the assessment, Flowers recommended to Mother that she and J.P. attend domestic violence counseling, that she undergo a psychological evaluation, and that she attend parenting classes.

### 3. Domestic Violence on August 23, 2009

A few days after August 23, 2009, when the police were called to the house, Mother told Dickinson

> that he [J.P.] came to their apartment, he was intoxicated, he accused her of cheating on him. At that point, he started hitting her in the head and the face with [his] hands. She stated that every time he was hitting her, she was seeing white and starting to black out. She told me that she grabbed a frying pan to try to defend herself. He subsequently took that from her and started hitting her with it. She said that [M.G.P.] was home during this incident. She told me the only reason it stopped was because he got tired. Once he had tired out, he told her to get [M.G.P.] and follow him to another apartment to watch some DVD[]s, so at that point, a little bit later, she contacted Fort Worth P.D. and told them about the domestic violence.[5]

---

[5]Petitioner's Exhibit 2 was admitted into evidence over objection. The exhibit contained a judgment and sentence, showing that J.P. pleaded guilty to the offense of assault bodily injury—family member, a Class A misdemeanor, and that the offense was committed August 23, 2009. The charging instrument stated that J.P. hit Mother with his hand on August 23, 2009, and that they were in a dating relationship.

6

Dickinson testified that Mother's use of the frying pan was self-defense, not an attack. Dickinson said that Mother was not the aggressor; she was the victim. Mother told Dickinson that J.P. had threatened to kill her when this incident happened.

During Dickinson's interview with Mother after the August 23 incident, she said that J.P. had also physically abused her while she was pregnant. Mother told Dickinson that she could not provide any type of food or transportation and could not pay rent; Mother relied completely on J.P. as her sole source of income and to provide necessities.

Dickinson testified that there was danger to then approximately six-month-old M.G.P. as a result of the domestic violence because she was exposed to the scene of Mother's and J.P.'s physically assaulting each other and because she was exposed to the potential of being injured. Dickinson said that M.G.P. could also have been injured when J.P. hit Mother while she was pregnant with M.G.P.

Dickinson transported Mother and M.G.P. to the police station because CPS wanted them to be in Safe Haven, and Safe Haven would not pick up clients from residences. Mother agreed to this move.

Dickinson was informed by CPS caseworker Dionne Flowers that she was going to see J.P. in jail and that Mother was going along. Flowers advised Mother that she should not go, but Mother said that she was going.

Melinda Esquibel, a Spanish-speaking CPS investigator, testified that she assisted Dickinson in his 2009 investigation of the case involving M.G.P. Esquibel translated a phone call[6] while J.P. was in jail for assaulting Mother.

J.P. indicated that he was intoxicated at the time of the assault. J.P. also said that this was not the first incident and that there had been two or three other times when he had engaged in domestic violence with Mother. J.P. admitted that he had "beat up on" Mother. J.P. did not indicate that Mother had "come at him with a frying pan" or that he had hit her with it. J.P. said that M.G.P. was in her bed when the domestic violence incidents occurred.

### 4. M.G.P. Removed

In September 2009, Mother agreed to take M.G.P. and move into Safe Haven. Safe Haven had a rule that its residents could not leave their children unattended, and although Mother had been told multiple times by Safe Haven staff not to leave M.G.P. alone in Mother's room at Safe Haven, Mother left M.G.P. alone in Mother's room at Safe Haven on several occasions while Mother stepped outside to smoke.[7] Mother was ultimately kicked out of Safe Haven for violating their rules, and M.G.P. was placed in a foster home. While M.G.P. was living at the first foster home, she showed up to visits with unexplained bruising. M.G.P. was then moved to a second foster home.

---

[6]The record states that J.P. "is from Mexico and is not in this country legally."

[7]On some of those occasions, M.G.P. was sleeping.

8

### 5. Two Instances of Domestic Violence — July 2010

Ten months after M.G.P.'s removal, Mother was shopping by herself at La Gran Plaza[8] in July 2010 when J.P., who was with two friends, saw Mother and hit her in the nose, causing it to bleed and feel "like it was broken." Mother said that J.P. hit her because "he's been [trying] to get back with me, but I know it's not going to work out because he's still violent towards me."

After the incident, Mother went back to Safe Haven and stayed there for two weeks. Mother did not file a police report after J.P. hit her in the nose because her mother had recommended that she not file a report as a result of her pending CPS case. Mother believed that her previous domestic violence report led to M.G.P.'s removal. Mother realized at trial that it would have been better if she had reported the incident to the police.[9]

Mother said that she had tried to stay away from J.P. But Mother admitted that in late July 2010, she had ridden in the same car as J.P. because she had no other way to get to court for a permanency hearing. Mother testified that she and J.P. met at her mother's house so that her mother could drive them to the hearing. J.P. tried to touch Mother in a sexually suggestive way, but after Mother told him not to and moved away, he hit her in the back. Mother said that J.P. hit

---

[8]Mother explained that La Gran Plaza was a mall.

[9]Mother said that she had tried reporting him in the past. She said that she did not know how else to tell him that she does not want to be with him. Mother said that she only spoke to J.P. because of M.G.P.

her because he saw some hickeys on her neck and found out that she had moved in with her boyfriend. Mother had bruises on her back as a result of the incident. Mother called the police, and an officer came and took a report from Mother.[10] Mother did not tell the judge about the assault during the permanency hearing.

## D. Extension of Case — July 23, 2010

Mother filed a motion for extension of the dismissal date, which was set for September 6, 2010. The trial court granted the motion, extending the dismissal date to March 2, 2011.

## E. Additional Testimony from the January 4, 2011 Termination Trial

### 1. Mother's Testimony

#### a. Mother's Other Children

Although Mother had given up a son when he was four months old and she was in her early twenties, she testified that she had grown up since then and was ready and able to care for a child.

#### b. Drugs

Mother admitted that she had used drugs once during the first month of her pregnancy when she did not know that she was pregnant with M.G.P. As soon as Mother found out that she was pregnant, she stopped using drugs. Mother

---

[10]Mother said at trial that she had not followed up with the police to see what the status of the case was.

had been clean "from everything" for two years at the time of trial. Mother had submitted to drug tests whenever CPS had requested them and was never told that she had tested positive for drugs. Mother took the CATS drug classes even though she had never been told that she had tested positive for drugs.

### c. Domestic Violence

Mother did not instigate any of the domestic violence altercations; she had been a victim, as opposed to the aggressor, in each of the scenarios involving J.P. Mother said that CPS told her that they had removed M.G.P. due to the domestic violence and Mother's drug abuse. Mother had not been with J.P. since September 2009; instead, she had removed herself from any danger that he created for her and M.G.P. Because Mother had removed herself from the situation and had stopped using drugs, she felt like she had met CPS's requirements.

### d. Services

Mother completed a drug class called CATS, a psychological evaluation, and parenting classes but had seven domestic violence classes left at the time of the termination trial. Mother admitted that the trial court had already given her one extension for six months to complete her Safe Haven domestic violence classes, and she agreed that was more than enough time to complete them. Mother said that even if she had finished the classes, that would not have stopped J.P. from hitting her in the nose when he saw her at La Gran Plaza. Even though she had not completed the domestic violence classes, Mother

11

believed that she had done everything to remove the danger to M.G.P. because she was no longer in a violent relationship and had learned from her classes how to avoid violent relationships.

### e.    Housing

Mother initially testified that since M.G.P.'s removal in September 2009, Mother had lived at two places.  Upon further review, the record revealed that Mother had lived at five places; she was living at Safe Haven when M.G.P. was removed, then she moved back to her apartment because the lease had not expired, then she moved to the Westchase Apartments with her boyfriend's brother, then she moved back to Safe Haven, and then she moved to the Country Place Apartments.  Mother explained that she had to go back to Safe Haven for two weeks because J.P. was looking for her; she and her boyfriend decided that it would be better for her to go back to Safe Haven until the locks at the apartment were changed.  Ultimately, they moved into Country Place because their lease expired.[11]  During the six months that Mother dated her boyfriend, she lived by herself in an apartment[12] and cleaned or babysat to make her $50 monthly rent; she paid for her food with food stamps.

---

[11]It is not clear from the record, but it appears that the lease may have expired during the time that Mother was at Safe Haven awaiting the locks being changed at Westchase.  So she moved from Safe Haven to Country Place, instead of back to Westchase.

[12]The Family Service Plan Evaluation dated January 25, 2010, states that "[Mother] has maintained her apartment."

### f. Mother's Living Conditions at Time of Trial

At the time of the termination trial, Mother was living with her boyfriend on the west side of town and had been living with him for approximately eight months.[13]  She and her boyfriend live with her boyfriend's brother[14] in a two-bedroom apartment.  Mother said that their rent is $415, which is divided with her boyfriend's brother; electricity is not included in their rent and usually runs $158 for two months.  Mother and her boyfriend had not had any physical fights, nor had she had any physical fights or verbal arguments with her boyfriend's brother.

Mother's boyfriend was working two jobs to support her financially.  He also supported her in her classes and drove her to classes;[15] when Mother's boyfriend could not drive her to her classes, he gave her money to take the bus.  Her boyfriend also gave her $60 a week for her to buy gifts to take to her visits with M.G.P. and supported Mother "in whatever way he [could]."

Mother said that CPS ran a background check on her boyfriend and that CPS told Mother that nothing negative came back.  Mother testified that she told

---

[13]Mother testified that she dated her boyfriend for six months before she started living with him; they had actually been together for fourteen months at the time of trial.

[14]Mother said that CPS did not ask for her boyfriend's brother's information.

[15]When asked about transportation, Mother said that her boyfriend's brother has a car.

the CPS supervisor that "if any moment there was something wrong with his, [sic] that's something I would go ahead and leave him right away."[16]

Mother testified that she was not working at the time of the trial. Mother later said that she was babysitting and making $200 or $300 a month. At the time of the termination trial, Mother owed the City of Fort Worth $700 for two traffic tickets that she had received in 2008 and had two Class C warrants out for her arrest, but she did not have the money to pay for those tickets.

Mother agreed that she had a hard time being independent in the past but said that she would look for a job because she still needs to be independent. She said, "I'm 24, so I need to be responsible for me and my daughter. She's mine. She's nobody's responsibility but mine."

### g.    Mother's Plans for M.G.P.

Mother had already spoken to someone who would watch M.G.P. while Mother attended the remaining Safe Haven classes. Mother said that if M.G.P. came to live with her, she would sleep in a crib in Mother's bedroom.

Mother testified that it was in M.G.P.'s best interest to be returned to her. Mother asked the trial court to return M.G.P. to her because she had done everything to remove the danger that was previously present and was in a better

---

[16]Mother did not ask her boyfriend if he had criminal history or CPS history in Mexico, where he was from. She thought that any criminal history would turn up when CPS ran the background check. Mother said that if "anything bad" had come up, she would use the little bit of money that she had saved up and move out.

situation. Mother testified, "There is no better place for her but to be with me, because I'm her mother."

### 2. CPS Supervisor's Testimony

Terica Brager, a supervisor with CPS, testified that the caseworker who was originally assigned to the case left CPS and that she took over the day-to-day responsibility for this case in September 2010. Brager explained that M.G.P. was removed from Mother's care due to concerns of domestic violence and neglectful supervision while she was with Mother at Safe Haven.

Brager said that in the past, Mother had not removed herself from domestically-violent situations. Brager was concerned, based on the numerous incidents of domestic violence with J.P., that Mother could not protect M.G.P. from emotional and physical danger now and in the future.[17] Brager said that it was important for Mother to complete the domestic violence education classes through Safe Haven because she had been a victim more than once and because she needed to learn how to protect herself and her child. However, Brager said that Mother's individual therapist may have covered the topic of how Mother could protect herself. Brager also admitted that Mother's failure to complete the domestic violence classes at Safe Haven would "probably not" have changed J.P.'s mind or kept him from hitting Mother. Brager agreed that Mother had testified that she was not looking for J.P. when she was hit by him in the

---

[17]There was no bruising noted on M.G.P. when Mother was with J.P.

15

nose and later in the back and that she had not been with him since September 2009.

Brager said that she had not seen Mother's ability to effect positive environmental changes within a reasonable time. Brager said that the case was opened in September 2009 and that it was not until September 2010 that Mother "began all of the things that she just now completed." Brager was concerned that Mother had fifteen months to work her service plan and had only worked services during the last three months to get M.G.P. back.

Brager said that Mother attended the majority of the visits. Brager recalled that there was an incident where Mother and J.P. argued during a visit with M.G.P. Despite that incident, Brager described Mother as loving, nurturing, and appropriate with M.G.P. during the visits; Brager did not have concerns about Mother's interactions with M.G.P.

Brager testified that she was very concerned that Mother would not be able to provide for M.G.P.'s physical needs now and in the future because Mother had been supported by other people "for quite some time." Brager had not seen in the fifteen months prior to the trial that Mother had made any effort to provide for M.G.P. on her own. Brager was concerned that Mother's boyfriend was "doing everything for her," and Brager wondered what would happen if their relationship ended.

In December 2010, Mother told Brager that it would be hard for her to care for M.G.P. Mother told Brager less than a month before the termination trial that

she (Mother) did not believe that she would regain custody of M.G.P. but that she would fight to the end; Mother believed that there was a ninety percent chance that she would not get M.G.P. back.

Brager testified that CPS does not return children only in situations where it will be easy; she agreed that it would be difficult for anyone, on her own without financial support, to care for a child. Brager agreed that Mother could get food stamps and Medicaid, but Brager said that the State would not pay for Mother's mortgage, utilities, and things like that. Brager agreed that at the time of trial, Mother had a place to live, had electricity, and had food.

Brager testified that she believed that it was in M.G.P.'s best interest for Mother's parental rights to M.G.P. to be terminated because she did not believe that the few changes that Mother had made in the three months prior to the termination trial were enough to "secure" M.G.P. for the rest of her life. Brager had observed M.G.P. interact with her foster parents, and she acted comfortable with them; she appeared to feel safe with them. Brager said that CPS's plan was for M.G.P. to be adopted by her foster parents, who were very capable of parenting M.G.P.; since March 2010, the foster parents had met all of M.G.P.'s needs, and she had remained safe.

### 3.    Attorney Ad Litem for M.G.P.'s

The attorney ad litem, Mary R. Thomsen, did not testify but gave a final argument in which she stated that she supported the petition of the Department of Family and Protective Services (the Department) to terminate Mother's and

J.P.'s parental rights to M.G.P. She stated that "[t]he child is doing well, developmentally on-target, in a safe place, happy, healthy, and I believe it would be in this child's best interest to remain where she is and for this court to terminate and allow the home that she's in, if this child is available for adoption."

### F. M.G.P.'s Status at the Time of Trial

According to Brager, M.G.P. was in a foster home and was doing "very well." She had no reported developmental delays, medical issues, or dental issues. M.G.P. had been evaluated by Early Childhood Intervention, and no concerns were found. M.G.P. was walking, talking, climbing, and interacting with the siblings in her foster home.

### G. Trial Outcome

After hearing the testimony above, the trial court found by clear and convincing evidence that Mother had knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endangered the physical or emotional well-being of the child, that Mother had engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the physical or emotional well-being of the child, and that termination of the parent-child relationship between Mother and M.G.P. was in the child's best interest.[18] The trial court also appointed the Department as permanent

---

[18]The trial court also terminated J.P.'s parental rights to M.G.P., but he did not appeal.

18

managing conservator of M.G.P., finding that it was in her best interest. Mother filed a motion for new trial, which the trial court denied. This appeal followed.

### III. LEGALLY INSUFFICIENT EVIDENCE OF CONDUCT AND ENVIRONMENTAL ENDANGERMENT TO SUPPORT TERMINATION ORDER

In her first through fourth issues, Mother argues that there is legally and factually insufficient evidence to establish the termination grounds under family code section 161.001(1)(D) and (E). The Department argues that there was ample evidence to support the trial court's conduct and environment findings because the trial court was entitled to find that Mother endangered M.G.P. by (1) using drugs during the pregnancy, (2) exposing M.G.P. to domestic violence, and (3) failing to timely work her service plan.

#### A. Burden of Proof and Standards of Review

A parent's rights to "the companionship, care, custody, and management" of her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges,

duties, and powers normally existing between them, except for the child's right to inherit. *See* Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West Supp. 2010); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243

S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

If we determine that no reasonable factfinder could form a firm belief or conviction that the grounds for termination were proven, then the evidence is legally insufficient, and we must generally render judgment for the parent. *J.F.C.*, 96 S.W.3d at 266; *see* Tex. R. App. P. 43.3.

## B.    Law on Endangerment

Endangerment means to expose to loss or injury, to jeopardize.  *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996).   To prove endangerment under subsection (D), the Department had to prove that Mother knowingly placed or allowed M.G.P. to remain in conditions or surroundings that endangered her physical or emotional well-being.   *See* Tex. Fam. Code Ann. § 161.001(1)(D); *In re J.A.J.*, 225 S.W.3d 621, 625 (Tex. App.—Houston [14th Dist.] 2006) (op. on reh'g), *judgm't aff'd in part, rev'd in part*, 243 S.W.3d 611 (Tex. 2007).   Subsection (D) focuses on the suitability of the child's living conditions.  *J.A.J.*, 225 S.W.3d at 626.  Thus, under subsection (D), it must be the environment itself that causes the child's physical or emotional well-being to be endangered, not the parent's conduct.  *Id.* at 627.

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of Mother's conduct, including acts, omissions, or failures to act.  *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E).  Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.   *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E).   It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury.  *Boyd*, 727 S.W.2d at

22

533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied). To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the child's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

**C.    Evidence Is Legally Insufficient to Support Endangerment Findings**

In determining whether the evidence is legally and factually sufficient to support termination of Mother's parental rights pursuant to subsection (D) or (E), we look at whether Mother (1) knowingly placed or knowingly allowed M.G.P. to remain in conditions or surroundings that endangered her physical or emotional well-being or (2) engaged in conduct or knowingly placed M.G.P. with persons who engaged in conduct that endangered her physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E). The Department's brief contains a combined legal and factual sufficiency analysis in which it focuses on three acts or omissions by Mother that it contends support termination of Mother's parental rights under (D) and (E):  the allegations that Mother endangered M.G.P. by (1) using drugs during the pregnancy; (2) exposing M.G.P. to domestic

23

violence; and (3) failing to timely work her service plan.  We will examine all of the evidence in the record, focusing on these allegations.

### 1. Drug Use During Pregnancy—Legally Insufficient (E) Ground

In her combined legal and factual sufficiency analysis, Mother argues that she demonstrated before and during the case that she did not have a substance abuse problem.  The Department argues that Mother's drug use while she was pregnant with M.G.P. endangered M.G.P.

The record demonstrates that Mother had used cocaine during her first month of pregnancy before she knew that she was pregnant[19] and that she had ceased using alcohol and drugs in January 2009.  M.G.P. was born without drugs in her system and had no developmental delays.  During the course of this case, Mother never tested positive for drugs, but she went ahead and completed the CATS drug classes as required by her service plan.  At the time of the termination trial, Mother had been clean from drugs and alcohol for two years.

In some instances, drug use may give rise to termination under section 161.001(1)(E).  *See Robinson v. Tex. Dep't of Regulatory Servs.*, 89 S.W.3d 679,

---

[19]Mother knew as of December 20, 2008, that she was pregnant because she told Dickinson about her pregnancy during his investigation of the burglary on that date.  As noted above, M.G.P. was born on July 2, 2009 at thirty-eight weeks' gestation.  The approximate date of conception was October 9, 2008.  Thus, it is possible that Mother used drugs for three months, depending on the exact date when she stopped using drugs.  However, as noted in Mother's brief, the evidence contains few details (i.e., dates, frequency, amounts, etc.) regarding Mother's drug use during this time.

686–87 (Tex. App.—Houston [14th Dist.] 2002, no pet.). However, the evidence in this case concerning Mother's alleged drug and alcohol use was limited to the time before she knew that she was pregnant; the fact that Mother quit using drugs when she learned that she was pregnant undermines the argument that she engaged in "a voluntary, deliberate, and conscious course of conduct" sufficient to support a termination finding under section 161.001(1)(E).[20] *See J.T.G.*, 121 S.W.3d at 125; *Ruiz v. Tex. Dep't of Family & Protective Servs.*, 212 S.W.3d 804, 818 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (holding that evidence of mother's narcotics use once during case and during a previous pregnancy was no evidence of 161.001(1)(E) conduct endangerment). Mother did what she was supposed to do under her service plan in order to prove that she did not have a substance abuse problem: she stayed drug-free for two years and never had a positive drug test during the time the case was pending.[21]

---

[20]The Department argues that it makes no difference whether Mother knew she was pregnant and quotes *R.W.*, 129 S.W.3d at 738–39, for the proposition that "scienter is only required under subsection (E) when a parent places the child with others who engage in an endangering course of conduct." As explained in the analysis above, Mother's drug use while she was unaware that she was pregnant does not, however, constitute "a voluntary, deliberate, and conscious course of conduct" to endanger her child.

[21]Moreover, as set forth above, Brager did not mention drugs as a reason for terminating Mother's parental rights; instead, at trial, the Department focused on Mother's delay in working services, her failure to complete the domestic violence classes, and the possibility that Mother could not provide for M.G.P. if Mother's relationship with her boyfriend ended.

Accordingly, we hold that the evidence of Mother's drug use during pregnancy is legally insufficient for a reasonable factfinder to form a "firm belief or conviction" that Mother engaged in conduct or knowingly placed M.G.P. with persons who engaged in conduct that endangered the physical or emotional well-being of M.G.P.[22] *See In re A.S.*, 261 S.W.3d 76, 86–87 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (holding that mother's use of marijuana once during her pregnancy—which led to baby testing positive for marijuana—was legally and factually insufficient to support termination of mother's parental rights under 161.001(1)(E); evidence showed that mother took prenatal vitamins during her pregnancy and did not consciously engage in a course of conduct that endangered child's well-being); *Ruiz*, 212 S.W.3d at 818 (holding that evidence of mother's narcotics use once during case and during a previous pregnancy was legally insufficient to support termination of mother's parental rights under 161.001(1)(E)).

### 2. Exposing M.G.P. to Domestic Violence—Legally Insufficient (D) and (E) Grounds

In arguing that the evidence regarding M.G.P.'s exposure to domestic violence is insufficient to support grounds (D) and (E), Mother points out that she suffered the misfortune of being assaulted by her child's father and that

---

[22]The Department does not argue that Mother's conduct in leaving M.G.P. alone in Mother's room at Safe Haven while she stepped outside to smoke constitutes conduct that endangered the physical or emotional well-being of M.G.P. We agree that under the facts presented this evidence does not constitute endangerment conduct.

victimization does not equate with voluntary acts of endangerment. The Department argues that the trial court was entitled to find that M.G.P. was a victim of Mother's failure to promptly get away from her abuser.

But the record establishes that two weeks after the December 6, 2008 attack, the Fort Worth Police Department responded to a call for a burglary of a habitation. The investigation revealed that J.P. had kicked in the door to get to Mother and had kicked her in the stomach. The record shows that (1) J.P. was no longer living with Mother, (2) he was not invited, (3) he did not have a key to her apartment, and consequently, (4) he had to kick in the door.

After M.G.P. was born, J.P. came to the apartment while he was intoxicated, accused Mother of cheating on him, and attacked her on August 23, 2009.[23] Mother tried to defend herself against J.P. with a frying pan, but J.P. ultimately used the frying pan against her. M.G.P. was approximately a month and a half old and was in her bed during this incident. The evidence is undisputed that there was no bruising on M.G.P. during the time Mother was in a relationship with J.P.[24] Mother agreed to go to Safe Haven after this incident.

---

[23]We note that Mother later said that she ended her relationship with J.P. in September 2009. This fact does not negate the possibility that the two were no longer living together on December 20, 2008 or August 23, 2009.

[24]*See Michael C. v. Tex. Dep't of Protective & Regulatory Servs.*, No. 05-96-01867-CV, 1998 WL 209055, at *21 (Tex. App.—Dallas 1998, pet. denied) (stating that in spite of evidence that father abused drugs and alcohol and could be "crazy" and "unpredictable" under the effects of those substances, Department failed to show the effect of this behavior on the children; no evidence that father abused children).

27

After M.G.P. was removed, J.P. ran into Mother while she was shopping at a mall and attacked her. Mother again sought shelter at Safe Haven to protect herself. Mother was attacked one other time when Mother and J.P. rode to court together.

CPS complains that Mother did not stay away from J.P., yet the record reflects that CPS apparently scheduled Mother's and J.P.'s visits with M.G.P. at or near the same time because the record reflects that they argued at one visit. The Family Service Plan Evaluation dated January 25, 2010 describes Mother as "enmeshed still" with J.P., but it is in relation to her interactions with him at the visits. There is no evidence that she was still living with him or in an on-going relationship with him.

Instead, at the time of trial, Mother had been dating her new boyfriend for fourteen months and had been living with him for eight months. There was no evidence of domestic violence with her new boyfriend. Because there was no evidence of Mother's being a victim of domestic violence prior to or after being involved with J.P., the record failed to establish that Mother had a pattern of being involved in abusive relationships and of exposing her children to domestic violence. Instead, the record discloses that after J.P. committed domestic violence against Mother on December 6, 2008, she took precautions to protect herself and to limit J.P.'s access to her, while still visiting M.G.P. at the times scheduled by CPS, despite the fact that CPS scheduled J.P.'s visits with M.G.P. at or near the same time as Mother's.

We hold that the evidence of domestic violence is legally insufficient for a reasonable factfinder to form a "firm belief or conviction" that Mother engaged in a course of conduct that endangered the emotional or physical well-being of M.G.P. *See A.S.*, 261 S.W.3d at 86–87 (holding evidence legally and factually insufficient to support terminating mother's parental rights under section 161.001(1)(E) because children did not witness two occasions of domestic violence); *see also In re V.S.R.K.*, No. 02-08-00047-CV, 2009 WL 736751, at *8 (Tex. App.—Fort Worth Mar. 19, 2009, no pet.) (mem. op.) (holding that trial court could not have reasonably formed a firm belief or conviction that appellant—as a direct result of his actions—engaged in a voluntary, deliberate, and conscious course of conduct or knowingly placed child with persons who engaged in conduct that endangered her physical or emotional well-being).

The record contains no testimony regarding the physical condition of any of the homes in which Mother and M.G.P. lived and no evidence of endangering living conditions that Mother knowingly placed or allowed M.G.P. to remain in. *See* Tex. Fam. Code Ann. § 161.001(1)(D). The possibility that J.P. might track down Mother again because he randomly ran into her at La Gran Plaza does not equate to Mother's knowingly placing M.G.P. in conditions or surroundings that would endanger her physical or emotional well-being.

We hold that the evidence of domestic violence is also legally insufficient for a reasonable factfinder to form a "firm belief or conviction" that Mother exposed M.G.P. to an endangering environment. *See A.S.,* 261 S.W.3d at 84–

29

85 (holding that evidence was legally and factually insufficient to support termination of mother's parental rights under (D) when, even assuming father's behavior was abusive and had occurred in front of the children, mother had taken responsive action to protect the children by taking them out of the environment); *see also Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990) (holding in conservatorship case "that a parent is a victim of spousal abuse, by itself, is no evidence that awarding custody to that parent would significantly impair the child").

### 3. Failing to Timely Work Service Plan—Legally Insufficient (D) and (E) Grounds

In its final argument regarding the sufficiency of the section 161.001(1) findings, the Department argues that Mother endangered M.G.P. by failing to timely work her service plan.[25] Because termination was not based on section 161.001(1)(O)—failure to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child, the failure to timely work the service plan must be linked to ground (D) or (E). *See* Tex. Fam. Code Ann. § 161.001(1)(O).

---

[25]All four cases cited by the State—for the proposition that a parent's failure to work her service plan will support a trial court's endangerment finding—focus on a parent who had a drug addiction. As discussed above, the record did not disclose that Mother was addicted to drugs but instead affirmatively showed that Mother was not addicted to drugs and had been clean for two years at the time of the termination trial. We need not discuss these cases because they are inapposite.

The Department argues in one sentence that Mother waited one year after the removal of M.G.P. to start working her CPS service plan and then concludes in the next sentence that "[t]he trial court was entitled to find that [Mother] endangered M.G.P. by failing to promptly work her services." The record reveals that Mother had completed outpatient drug treatment "early on in the case" and that Mother utilized the extension that the trial court granted her; she worked all of her services except for the last seven sessions of the domestic violence class. Mother admitted that she had enough time to complete the domestic violence class and was not questioned about why she was unable to complete the class. Even considering Mother's failure to complete the domestic violence class, we are unable to ascertain how the failure to complete the last seven sessions of the domestic violence class constitutes evidence of ground (D) endangering environment or evidence of ground (E) endangering conduct because Brager, a supervisor with the Department, testified that Mother's completing the domestic violence class would "probably not" have prevented J.P. from hitting Mother and that Mother's counselor may have gone over the domestic violence information with Mother.

We hold that evidence that Mother failed to promptly work her services is legally insufficient for a reasonable factfinder to form a "firm belief or conviction" that Mother knowingly placed or knowingly allowed M.G.P. to remain in conditions or surroundings that endangered her physical or emotional well-being and that Mother had engaged in conduct or knowingly placed M.G.P. with

31

persons who engaged in conduct that endangered her physical or emotional well-being.

### 4. Conclusion

We therefore sustain Mother's first and third issues challenging the legal sufficiency of the endangerment findings.[26]  Because these issues are dispositive, we need not address Mother's other issues.  *See* Tex. R. App. P. 47.1.

## IV. CONSERVATORSHIP

The Department's petition to terminate Mother's parental rights requested that it be appointed M.G.P.'s permanent sole managing conservator only "[p]ursuant to §§ 153.005 and 263.404," not pursuant to section 153.131.  *See* Tex. Fam. Code Ann. §§ 153.005, 153.131, 263.402 (West 2008).  Section

---

[26]To the extent that the trial court might have based its decision to terminate Mother's parental rights to M.G.P. on the Department's argument that it feared that Mother would not be able to provide for M.G.P. if Mother's relationship with her boyfriend ended, such decision was erroneous because a trial court cannot terminate parental rights based on an assumption or speculation.  *See Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied) (stating that belief that mother "lives with a man who is involved in drugs is no more than a mere surmise or suspicion, which is not the same as evidence") (citing *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).  Additionally, a parent's rights cannot be terminated based on poverty without a showing that the poverty has endangered the child.  *See Doyle v. Tex. Dep't of Protective & Regulatory Servs.*, 16 S.W.3d 390, 398 (Tex. App.—El Paso 2000, pet. denied).  Nor can a parent's rights be terminated based on a foster family's ability to provide more than a biological parent can provide.  *See generally In re W.C.*, 98 S.W.3d 753, 758 (Tex. App.—Fort Worth 2003, no pet.) (stating that under best interest prong of section 161.001(2), termination should not be used to merely reallocate children to better and more prosperous parents).

153.005 provides generally that in a suit affecting the parent-child relationship, "the court may appoint a sole managing conservator or may appoint joint managing conservators." Tex. Fam. Code Ann. § 153.005 (West 2008). Section 263.404 does not apply when the trial court's order terminates parental rights. *J.A.J.*, 243 S.W.3d at 614. Thus, the only available statutory mechanism for the Department's appointment as M.G.P.'s managing conservator was as a consequence of the termination, pursuant to family code section 161.207. *See* Tex. Fam. Code Ann. § 161.207 (West 2008); *In re D.N.C.*, 252 S.W.3d 317, 319 (Tex. 2008). Consequently, because the Department did not seek conservatorship based on section 153.131, Mother's challenge to the Department's conservatorship was subsumed within her appeal of the termination order. *See D.N.C.*, 252 S.W.3d at 319. We therefore also reverse the trial court's conservatorship appointment. *See id.* (upholding appellate court's reversal of conservatorship appointment when Department's appointment was solely the consequence of termination decision under family code section 161.207).

## V. DISPOSITION

Having sustained Mother's first and third issues and having determined that we need not address her other issues, we reverse the trial court's judgment terminating Mother's parental rights to M.G.P. and render judgment denying the Department's petition to terminate Mother's parental rights to M.G.P. Because Mother's challenge to the Department's conservatorship was subsumed within

her appeal of the termination order, we likewise reverse the trial court's appointment of the Department as the permanent managing conservator of M.G.P.  We remand the case to the trial court for the limited purpose of rendering an order consistent with family code section 161.205(2).  *See* Tex. Fam. Code Ann. § 161.205(2) (West 2008); *A.S.*, 261 S.W.3d at 93 n.19.


                                        SUE WALKER
                                        JUSTICE

PANEL:  DAUPHINOT, WALKER, and MCCOY, JJ.

MCCOY, J. dissents without opinion.

DELIVERED:  December 22, 2011